Student Housing Law is <u>ultra vires</u> and should be declared null and void as outside the Town's grant of police powers from the State.

30. The Adult Student Housing Law is also unconstitutionally vague, and is inconsistent with certain other provisions of the Town's Zoning Law. Petitioners/Plaintiffs thus request that the Adult Student Housing Law be declared null and void as a matter of law in its entirety.

THE PARTIES

31. Petitioner/Plaintiff, the Village of Chestnut Ridge ("Chestnut Ridge"), is a municipal corporation existing by and under the laws of the State of New York, located within the Town of Ramapo, with offices at 277 Old Nyack Turnpike, Chestnut Ridge, New York 10977.

32. By Resolution dated July 15, 2004, the Board of Trustees for the Village of Chestnut Ridge authorized the retention of counsel and the commencement of this proceeding on behalf of Chestnut Ridge.

33. Petitioner/Plaintiff, the Village of Montebello ("Montebello"), is a municipal corporation existing by and under the laws of the State of New York, located in the Town of Ramapo, with offices at 1 Montebello Road, Suffern, New York 10901-3901.

34. By Resolution dated July 13, 2004, the Board of Trustees for the Village of Montebello authorized the retention of counsel and the commencement of this proceeding on behalf of Montebello.

35. Petitioner/Plaintiff, the Village of Pomona ("Pomona"), is a municipal corporation existing under the laws of the State of New York, located in the Towns of Ramapo and Haverstraw, with offices at 100 Ladentown Road, Pomona, New York 10970.

36. By Resolution dated June 28, 2004, the Board of Trustees for the Village of Pomona authorized the retention of counsel and the commencement of this proceeding on behalf of Pomona.

37. Petitioner/Plaintiff, the Village of Wesley Hills ("Wesley Hills"), is a municipal corporation existing by and under the laws of the State of New York, located in the Town of Ramapo, with offices at 432 Route 306, Wesley Hills, New York 10952.

38. By Resolution dated July 13, 2004, the Board of Trustees for the Village of Wesley Hills authorized the retention of counsel and the commencement of this proceeding on behalf of Wesley Hills.

39. Petitioner/Plaintiff Jay Rosenstein is an individual residing on Skylark Drive in the Village of Wesley Hills in the Town of Ramapo, near the property known as the Nike Site.

40. Petitioner/Plaintiff Robert Moskowitz is an individual residing on Fessler Drive in the Village of New Hempstead in the Town of Ramapo, near the property known as the Nike Site.

41. Petitioner/Plaintiff Milton B. Shapiro is an individual residing on Scenic Drive in the unincorporated Town of Ramapo, adjacent to the property known as the Patrick Farm Site.

42. Petitioner/Plaintiff Dr. Sonya Shapiro is an individual residing on Scenic Drive in the unincorporated Town of Ramapo, adjacent to the property known as the Patrick Farm Site.

43. Respondent/Defendant, the Town of Ramapo, is a duly organized municipality existing by and under the laws of the State of New York, with offices at 237 Route 59, Suffern, New York 10901.

44. Respondent/Defendant, the Town Board of the Town of Ramapo, is a legislative body formed pursuant to New York State law, with offices at Town Hall, 237 Route 59, Suffern, New York 10901. The Town Board was the lead agency under SEQRA for the environmental review and adoption of the Adult Student Housing Law.

45. Respondent/Defendant, the Planning Board of the Town of Ramapo, is a municipal body, with offices at Town Hall, 237 Route 59, Suffern, New York 10901. Any application processed pursuant to the Adult Student Housing Law would come before the Planning Board.

46. Respondent/Defendant the Board of Appeals of the Town of Ramapo is a municipal body, with offices at Town Hall, 237 Route 59, Suffern, New York 10901.

47. Upon information and belief, and as set forth by Respondents/Defendants, applications pursuant to the Adult Student Housing Law are currently pending or are imminent for one or more of the four sites identified by the Town in the environmental assessment for application of the Adult Student Housing Law.

48. Respondent/Defendant Yeshiva Chofetz Chaim of Radin ("Chofetz Chaim"), located in Suffern, Rockland County, New York, is the owner of and applicant for the properties known as the Nike Site and the Highview Road Site.

49. Chofetz Chaim has submitted a site plan application to the Town Planning Board for married adult student multi-family housing to be located within the unincorporated Town of Ramapo, on Grandview Avenue on the Nike Site. Not only would this proposal be

permitted under the Adult Student Housing Law, but the Adult Student Housing Law carves out an exception to its buffering requirement, which is specifically applicable to only one piece of property -- the Nike Site -- without any explanation except that the Nike Site cannot meet the buffering requirement.

50. The Town Planning Board has already issued an improper negative declaration of environmental significance for Respondent/Defendant Chofetz Chaim's site plan application on the Nike Site.

51. Upon information and belief, Chofetz Chaim has also submitted an application for one or more variances to the Town Board of Appeals for its married adult student multi-family housing proposal at the Nike Site.

52. Upon information and belief, Respondent/Defendant Scenic Development LLC, located in Nanuet, Rockland County, New York, is the owner of the property known as the Patrick Farm Site.

## JURISDICTION

53. The Court has subject matter jurisdiction, and may exercise personal jurisdiction over the Respondents/Defendants in this matter.

54. Pursuant to CPLR Section 506(b), venue is proper in this Court. The determinations complained of were made and the material events took place in the County of Rockland, which is situated within the Ninth Judicial District.

55. No prior application for this or any similar relief has been made to this or any other Court, except for the related law suit referred to herein as <u>Ramapo I</u>.

56. On or about November 9, 2004, Respondent/Defendant Chofetz Chaim removed this matter to the United States District Court for the Southern District of New York.

11

Subsequently, Respondent/Defendant Chofetz Chaim withdrew its removal petition, and without objection from any party, this matter was subsequently remanded to this Court pursuant to an Order of Remand dated December 10, 2004.

## FACTUAL BACKGROUND

### The Town Of Ramapo

57. The Town of Ramapo is located in southern Rockland County. More than one-half of the geographical area of the Town is comprised of twelve incorporated Villages situated in an irregular ring bordering the areas of Monsey, Viola and Hillcrest, which form the Town of Ramapo's "central hub." The unincorporated areas of the Town are dominated by medium to high density residential, industrial and commercial uses.

58. In contrast, with the exception of relatively small areas of the Petitioner/Plaintiff Villages of Montebello and Chestnut Ridge, which lie along the New York State Thruway/Route 59 corridor, land use within the bordering Petitioner/Plaintiff Villages is almost exclusively low to medium density residential. The neighborhoods in the Petitioner/Plaintiff Villages are predominantly made up of single-family residences in zoning districts generally ranging from R-25 to R-50 (25,000 square foot lots and 50,000 foot lots, respectively).

59. The Villages share much of the Town's infrastructure, including, roadways, water supply, schools and sewage treatment systems. Thus, any meaningful increase in population density in the unincorporated Town along the Village borders would result in potential significant impacts to the Villages.

The Town Proposes An Updated Comprehensive Plan

60. In or about July 2000, the Town authorized the preparation of an update to the Town's Comprehensive Plan to govern zoning and development of the unincorporated areas of the Town.

61. In or about February 2001, the Town retained a consultant to prepare the update to the Comprehensive Plan.

62. A draft Comprehensive Plan was completed in or about September 2002.

63. The Comprehensive Plan proposes a series of major zoning changes in areas throughout the unincorporated portion of the Town. These changes primarily involve the rezoning of residential districts in the Town so as to significantly increase density in the zoning districts bordering the lower density residential Village areas. The Comprehensive Plan also proposes to convert various non-residential districts to higher density residential districts.

The Town Prepares A Generic Environmental
Impact Statement For The Comprehensive Plan

64. In conjunction with the preparation of the Comprehensive Plan, the Town retained the same consultants who prepared the Comprehensive Plan to prepare a Generic Environmental Impact Statement ("GEIS") for the Comprehensive Plan pursuant to SEQRA.

65. As defined by the regulations governing SEQRA, a "generic EIS[ ] may be broader, and more general than site or project specific EISs and should discuss the logic and rationale for the choices advanced. They may also include an assessment of specific impacts if such details are available. They may be based on conceptual information in some cases." 6 NYCRR § 617.10(a).

66. The Town accepted a Draft GEIS on the proposed Comprehensive Plan as complete in March 2003.

67. The Town scheduled the only public hearing on the Town's DGEIS for the evening of April 7, 2003, only 18 days after the release of the DGEIS. Due to a freak snowstorm, the Board was forced to adjourn commencement of the public hearing to the evening of April 28, 2003.

**The Town Adds A Section On Adult Student Multi-Family Housing To The Comprehensive Plan Following Completion of the GEIS Without Any Environmental Studies**

68. Many parties commented on the DGEIS and Comprehensive Plan, in writing and orally at the public hearing.

69. In one written comment to the Town on the DGEIS and the Comprehensive Plan, dated May 2, 2003 (submitted after the close of the public hearing), Respondent/Defendant Chofetz Chaim requested that the Comprehensive Plan provide for adult student housing for married students and their families while the students continue their post-secondary education. Respondent/Defendant Chofetz Chaim was the only party to comment in this regard.

70. Respondent/Defendant Chofetz Chaim, in its written comment, pointed out "one glaring deficiency in the proposed plan that needs to be addressed . . . [is that] [t]he community has many young men who marry and continue their pursuit of a rabbinical or secular degree for several years after marriage. These young students are in need of dormitory housing that would provide all the needed space for their families to thrive while they pursue their educational goals." (FGEIS at F-53, Exh. "2").

71. Further, Respondent/Defendant Chofetz Chaim noted that it had previously submitted a plan for adult student dormitory housing for one of the properties it owns

14

at "the former US army base on five acres off Grandview Avenue" in the Town (i.e., the Nike Site), but had been advised that the zoning did not allow this use. (Id.).

72. In response to this comment, the Town included in its FGEIS, without any further environmental study, a proposal that the Comprehensive Plan provide for and accommodate married adult student multi-family housing.

73. As such, a provision for "Student Housing" was added to the "Community Resources and Character" chapter of the Comprehensive Plan, after completion of the GEIS.

74. The "Student Housing" provision stated that "[t]he Town recognizes the need for married student housing within the Town and recognizes that an appropriate solution to this issue needs to be addressed. The Town should develop an appropriate approach to address this issue." (Comprehensive Plan at C-8, Exh. "3").

75. Of significance here, the Town promised in the FGEIS, as it would do on several other occasions, that, "a specific analysis of how to implement any zoning changes will need to be undertaken." (FGEIS at F-53, Exh. "2").

76. The "Student Housing" provision in the Comprehensive Plan also recognized that "[a] specific analysis of how to implement any zoning changes should be undertaken. Providing a proper balance between the need for married student housing and the community's interest in minimizing impacts to neighboring areas would be a critical consideration." (Id.).

77. Thus, as admitted by the Town, adult student housing was not originally included in the Comprehensive Plan, as well as was not studied in the GEIS. It was added to the Comprehensive Plan after the environmental review of the Comprehensive Plan was completed,

15

and the Town promised to undertake a full environmental review prior to enacting any new zoning amendments.

**The Town Adopts The Comprehensive Plan, And Once Again, Assures The Public That A Supplemental Environmental Review Would Be Undertaken Prior To Any Rezonings**

78. As it would do throughout these proceedings, the Town once more promised in response to <u>Ramapo I</u> that before any actual rezonings, the Town would undertake a supplemental environmental impact statement that "will provide an analysis, as appropriate and as required by law, of the potential environmental impacts of the proposed zoning changes. This analysis generally will be more detailed than that provided in the GEIS process, although where adequate the studies, analyses and findings made in that process will be used." (Affidavit of John F. Lange, sworn to July 30, 2004, ¶ 38, Exh. "4").

79. The Town's response in <u>Ramapo I</u> reflected similar statements in its SEQRA Findings with respect to its adoption of the Comprehensive Plan that "any actual rezoning of the Town or any portion of it must comply with applicable provisions of law, including ... SEQRA." (Affidavit of Christopher P. St. Lawrence, sworn to July 28, 2004, ¶ 9, Exh. "5").

80. Likewise, the Town Supervisor has stated on numerous occasions that any rezonings would not be done in a piecemeal fashion. The rezonings would be proposed and studied all at once so their entire impact could be properly evaluated together.

81. Yet, contrary to the Town's representations and the law, at the Town's very first opportunity to adopt a new zoning law following the Comprehensive Plan, the Town adopted the subject Adult Student Housing Law in a piecemeal fashion and without compliance with SEQRA or other applicable law.

### The Town Proposes New Zoning Law

82. After adopting the Comprehensive Plan, in or about April 2004, the Town proposed a new zoning law to permit adult student multi-family housing in most single-family residential zoning districts throughout the Town of Ramapo.

83. As even acknowledged by the Town, the new zoning law has the potential to impact over 100 sites within the Town. (Environmental Assessment Form ("EAF") Narrative at 2, Exh. "6").

84. As originally proposed, the new zoning law provided, inter alia, that multi-family housing would be permitted as a special permit use in residential zones as an accessory use to post secondary educational institutions in order to provide housing for adult students. The minimum lot size would be four acres, with a density not to exceed 16 units per acre. The educational institution must occupy at least 10 per cent of the project site.

85. Thus, with only a nominal educational institution on the site, the proposed Adult Student Housing Law would allow high density multi-family housing within a residential zone in the unincorporated Town of Ramapo, potentially impacting traffic, water supply, available sewer capacity, schools, services and the character of the surrounding neighborhoods.

### The Town Refers The New Adult Student Housing Law To Rockland County For Required General Municipal Law Review

86. Pursuant to the requirements of General Municipal Law §§ 239-l and 239-m, on or about April 30, 2004, the Town referred the new proposed Adult Student Housing Law to the Rockland County Department of Planning for its review and recommendations.

87. Upon reviewing the proposed Adult Student Housing Law, the County, in a letter dated June 2, 2004, expressed "concerns about the proposal," and recommended modifications. (Exh. "7").

88. Specifically, the County noted that the proposed Adult Student Housing Law provides for the adult student housing to be an accessory use to an educational institution, yet the adult student housing component could occupy more than 50% of the site under the Adult Student Housing Law, making this "a primary use not an accessory use." (Id.).

89. The County also expressed concern over "the impact of what is essentially a multi-family housing development on the existing infrastructure," especially since adult student housing was not originally considered in the environmental studies for the Comprehensive Plan and thus there were no opportunities to comment on the potential impact to sewer and water. (Id.).

90. The County further indicated that the impact to the community character of low-density neighborhoods in adjoining municipalities, especially the Villages, of such adult student multi-family housing developments would be "<u>significant</u>." (emphasis supplied) (Id.).

91. The Town, as set forth infra, overrode the County's GML review, and responded to few of its concerns.

<u>The Town Holds A Public Hearing On The Adult Student Housing Law</u>

92. On or about June 2, 2004, the Town held a public hearing on the proposed Adult Student Housing Law. Numerous people spoke in opposition to the Law.

93. Following the public hearing, the Town made several changes to the Adult Student Housing Law, including, adding a requirement that the students be married; changing to 30 days from 6 months within which the students must vacate when they are no longer eligible for the housing; adding a limitation on maximum lot size to 12 acres; adding a requirement that the project be located on an already existing lot that meets the lot size requirements or be created

by subdivision from a larger lot; adding an occupancy limitation of 6 years; and changing the buffering requirements.

94. These changes were material and substantial, requiring that the public and the County have the appropriate opportunity to provide comments on these revisions. The Town refused to hold an additional public hearing.

95. The Town also refused to refer the revised Adult Student Housing Law to the County for further GML review as required under the General Municipal Law.

The Town Conducts A Superficial, Incomplete SEQRA Review

96. In conjunction with the required GML review and public hearing, the Town also instituted its environmental review of the proposed Adult Student Housing Law under SEQRA.

97. Pursuant to the requirements of SEQRA, the Town Board declared itself lead agency. Of significance, it also determined that the proposed Adult Student Housing Law was a Type 1 action.

98. The Town's designation of the proposed Adult Student Housing Law as a Type I action, according to the SEQRA regulations, "carrie[d] with it the presumption that it is likely to have a significant adverse impact on the environment and may require an EIS [environmental impact statement]." 6 NYCRR § 617.4(a)(1).

99. The Town's consultant completed the checklists in Parts 1 and 2 of the EAF, and prepared a brief four and one half page "narrative" for Part 3 of the EAF.

100. As stated in the SEQRA regulations, an EAF is a form used by a lead agency "to assist it in determining the environmental significance or nonsignificance of actions.

A properly completed EAF must contain enough information to describe the proposed action, its location, its purpose and its potential impacts on the environment." 6 NYCRR § 617.2(m).

The EAF Fails To Take The Required "Hard Look"
At Potential Significant Environmental Impacts

101. In the "EAF Narrative," the Town's consultant initially identified over 100 sites that could meet the Adult Student Housing Law's requirements, and receive the conditional use permit for adult student multi-family housing use.

102. Using some unknown, arbitrary determination, however, the consultant concluded that only four sites within the Town might seek the use: the Nike Site, Patrick Farm Site, Highview Road Site and Spruce Road Site. The consultant thus limited the EAF Narrative's analysis to these four sites only. The consultant's conclusion was not based upon any empirical data or evaluation.

103. The EAF also provided no analysis, let alone the required "hard look," of the potential impact on the character of the community from placing high density uses in the middle of low density single-family houses, not even for the four known sites discussed below.

104. Nor did the EAF provide any analysis, let alone the required "hard look," of the potential traffic impacts from the Adult Student Housing Law on the four known sites, except for the unsupported statement that most of the students will stay on site for the majority of the days, and in "some specific cases, spouses may not drive." (EAF Narrative at 2, Exh. "6").

105. The EAF also provided no analysis, let alone the required "hard look," of any impacts to the infrastructure from the Adult Student Housing Law, including, important potential impacts to the water, sewer and road infrastructure that the Villages share with the Town that would result from the significant increase in housing density under the Adult Student Housing Law.

106. The Town completely ignored the fact that the Adult Student Housing Law would create substantial increases in water and sewer demand over development under existing zoning. Normal water consumption of single-family and multi-family dwellings is 100 gallons and 75 gallons per person per day, respectively. An average family size in single-family dwellings on larger lot sizes is 4 persons per unit, and multi-family dwellings is 5.5 persons per unit. The combination of these factors yields a dramatic increase in water consumption with a multi-family adult student housing use pursuant to the Adult Student Housing Law, over existing single-family zoning.

107. If the Town had performed the requisite environmental review it would have found that there would be a significant potential environmental impact from the dramatic increase in water consumption from the extensive development of adult student multi-family housing use that would be permitted under the proposed Adult Student Housing Law.

108. Because most water brought into a dwelling is eventually released through a sewage treatment system, if the Town had performed the requisite environmental review, it would have also found that the increases in required sewage treatment of the potential development permitted under the Adult Student Housing Law would have been of the same magnitude as that of the water consumption.

109. The Town also failed to perform the requisite traffic analysis that the enactment of the Adult Student Housing Law and the development of adult student housing would have on the local roadways. If the Town had performed this requisite environmental review, the Town would have found that the enactment of the Adult Student Housing Law would generate significant volumes of traffic, certainly well above present levels of traffic generation.

Further, the Town would have learned that there is insufficient capacity at the roadway locations and intersections most likely impacted by the traffic.

110. An adequate review of the traffic impacts from the Adult Student Housing Law would have shown that the enactment of the Adult Student Housing Law would likely have a significant adverse impact on area traffic operating conditions, as well as that adequate mitigation measures may not be feasible.

111. The Town essentially deferred the aforementioned analyses to a later time, even when the Town acknowledged that at least one site was currently the subject of a specific site plan proposal under the proposed and now enacted Adult Student Housing Law.

The Town Also Failed To Take The Required "Hard Look" At The Potential
Significant Impacts From The Adult Student Housing Law On Four Known
Sites It Specifically Identified As Likely To Be Developed For This Use

112. Indeed, the Town identified four sites that would likely be developed under the proposed Adult Student Housing Law: Patrick Farm Site, Nike Site, Highview Road Site and Spruce Road Site.

113. The Town in considering and enacting the Adult Student Housing Law was required at a minimum to look at the potential environmental impacts to the Villages and the single-family neighborhoods surrounding the four sites, let alone the other 96 parcels it identified would be eligible. The Adult Student Housing Law would in effect rezone the sites from low density single-family, to high-density multi-family.

Patrick Farm Site

114. The Patrick Farm Site comprises approximately 200 acres, which are presently zoned primarily R-80 (80,000 square foot lots). The Patrick Farm Site is located in the northern part of Ramapo, bounded by Route 306 to the west, Route 202 to the north and the